DJS:sr

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **00-6270** 1

18 U.S.C. §1343
18 U.S.C. §371
18 U.S.C. §2

**CR - GRAHAM**



UNITED STATES OF AMERICA,  :

        Plaintiff,    :

v.    :

EDWARD HEXTER,    :
   a/k/a "David Best,"
MARK GOLDBERG,    :
   a/k/a "Mike Gordon,"
   a/k/a "David Best,"    :
   a/k/a "Bill Swanson,"
ROBY DUDLEY,    :
   a/k/a "Ted Brown,"
   a/k/a "Ed White,"
   a/k/a "Russ Walton,"    :
CHARLIE MARTIN,
   a/k/a "Charlie Cole,"    :
   a/k/a "Fred Murphy,"
   a/k/a "Jerry Fried,"    :
and
HANNIBAL PENNY,    :
   a/k/a "Jim St. James,"
   a/k/a "Lincoln Green,"    :
   a/k/a "Dr. Grant Maxwell,"    :
   a/k/a "Dr. St. James,"    :

        Defendants.    :

---

INDICTMENT

COUNT 1

The Grand Jury charges that:

1



1. From on an unknown time, but at least by April 1, 1991, through a date on or about July

17, 1996, in Broward County, and elsewhere, in the Southern District of Florida, the defendants,

> EDWARD HEXTER,
> a/k/a "David Best,"
> MARK GOLDBERG,
> a/k/a "Mike Gordon,"
> a/k/a "David Best,"
> a/k/a "Bill Swanson,"
> ROBY DUDLEY,
> a/k/a "Ted Brown,"
> a/k/a "Ed White,"
> a/k/a "Russ Walton,"
> CHARLIE MARTIN,
> a/k/a "Charlie Cole,"
> a/k/a "Fred Murphy,"
> a/k/a "Jerry Fried,"
> and
> HANNIBAL PENNY,
> a/k/a "Jim St. James,"
> a/k/a "Lincoln Green,"
> a/k/a "Dr. Grant Maxwell,"
> a/k/a "Dr. St. James,"

did knowingly, willfully and unlawfully, combine, conspire, confederate and agree with each other

and others both known and unknown to the grand jury to commit an offense against the United

States, that is, having devised and intended to devise a scheme and artifice to defraud and for

obtaining money and property from persons throughout the United States by means of false and

fraudulent pretenses, representations and promises, and for the purpose of executing said scheme and

artifice, all the while knowing that said pretenses, representations and promises would be and were

false and fraudulent when made, did knowingly cause to be transmitted in interstate commerce certain

signs, signals and sounds by means of wire communication, that is, interstate wire and telephone

conversations and signals for the purposes of executing the scheme and artifice to defraud, in

2

violation of Title 18. United States Code, Sections 1343 and 2.

## BACKGROUND

At various times material to this Indictment,

2.  Best Marketing, Inc., was a Florida corporation operating out of 4300 North University Drive, Suite D-206, Lauderhill, Florida, in Broward County, in the Southern District of Florida. Best Marketing, Inc., (hereinafter "Best" or "Best Marketing") was purportedly in the business of selling advertising products (also known as advertising specialty items) such as printed or embossed pens, key chains, magnets, caps, ice scrapers/removers, mugs and other items which could be imprinted with business and/or advertising text and information. Sales were primarily made by way of interstate telephone calls.

3.  Defendant EDWARD HEXTER (hereinafter " HEXTER") owned and controlled Best Marketing during its operation. HEXTER caused and participated in the formation of Best Marketing and directed the operations of Best personally, as well as through management and other employees whom HEXTER hired, supervised and controlled, or whose hiring, supervision and control he caused and directed. As part of the operation of Best Marketing, HEXTER used a registered alias or "doing business as" designation for himself as "David Best," as President of Best Marketing.

4.  Defendants MARK GOLDBERG, ROBY DUDLEY, CHARLIE MARTIN, and HANNIBAL PENNEY, were employed by HEXTER as salesmen and "loaders" or "re-loaders" at Best Marketing. and, at the various times of their employment, were particularly successful salesmen who were entrusted with difficult and/or potentially lucrative customers. As a result of the skill of these employees and their ability to weave misrepresentations or omissions, as convenient or

3

necessary, into sales presentations, Best Marketing profited to a significant degree in the course of conduct which acted as a fraud on its customers.

5.     Defendant MARK GOLDBERG, ("GOLDBERG") from at least 1991 continuing to and through at least July 17, 1996, worked as a telephone salesman and/or "loader/re-loader" to solicit money from customers for the purchase of advertising specialty items and products. To facilitate sales, GOLDBERG used various names over the telephone ("phone names") including "Mike Gordon," "David Best," and "Bill Swanson," as his adopted identities.

6.     Defendant ROBY DUDLEY ("DUDLEY") worked as a salesman and/or "loader/re-loader" for Best Marketing from at least 1991 through at least July 17, 1996, where he solicited funds from telephone customers for the purchase of advertising specialty items and products. To facilitate sales, DUDLEY used various phone names, including "Ted Brown," "Ed White," and "Russ Walton," as his adopted identities.

7.     Defendant HANNIBAL PENNEY ("PENNEY") worked as a salesman and/or "loader/re-loader" for Best Marketing from on or about December 1995, through approximately at least July 17, 1996, where he solicited funds from telephone customers for the purchase of advertising speciality items and products. To facilitate sales PENNEY used various phone names, including "Lincoln Green," "Dr. Grant Maxwell," "Dr. St. James," and "Jim St. James."

8.     Defendant CHARLES MARTIN ("Martin") worked as a salesman and/or "loader/re-loader" for Best Marketing from in or about December 1995, through approximately at least July 17, 1996, where he solicited funds from telephone customers for the purchase of advertising speciality items and products. To facilitate sales, MARTIN used various phone names, including "Charlie Cole," "Fred Murphy", and "Jerry Fried."

4

9.    All of the above-named defendants engaged in "telemarketing" as defined in Title 18, United States Code, Section 2325, that is, a plan, program and promotion to induce the purchase of goods by use of at least one interstate telephone call initiated by a person conducting such plan, program and promotion.

## OBJECTS OF THE CONSPIRACY

10.    It was an object of the conspiracy that the defendants, having devised and intending to devise a scheme and artifice to defraud, would and did obtain monies and credits from customers by making and/or causing the making of false, misleading and fraudulent statements, representations and promises, all for the purpose of the enrichment of the defendants and others employed by Best Marketing.

11.    It was further an object of the conspiracy that defendants would induce the sale of goods and merchandise at inflated prices over the telephone, by knowingly and willfully concealing and omitting material facts, all of which worked together to conceal the fraudulent nature of the business operations and sales and the true identities and status of those who enriched themselves through the conspiracy, which was a scheme and artifice to defraud.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means employed by defendants to accomplish the objects of the conspiracy included the following:

12.    From an unknown time prior to April 1, 1991, until at least approximately July 17, 1996, Best Marketing would purchase names of potential customers ("leads") or "lead sheets" from other businesses or entities, including, from time to time, Dunn and Bradstreet and American Business Lists. Many of those targeted as customers would include small businesses, many of which would

5

have less exposure to sophisticated advertising programs, and thus, less experience with average and normal pricing for advertising speciality items and the common means of marketing them.

13. It was part of the conspiracy that salespersons would be employed to act as "fronters" in the "front room" to initiate calls (literally, the first round of telephone calls from Best) to potential customers, primarily owners of small businesses, to tell each customer that he or she was eligible to receive one of a list of "premiums" or "bonuses" awarded to purchasers of certain advertising speciality items. The specialty items could be imprinted with the business name, address, and/or telephone number, and /or a slogan such as "Say No to Drugs." Typically the "premium" list would include five items initially, though the number of "premiums" or bonus awards might vary from four to six, or even more on later offers. A typical list of premiums would include (by way of example) the following:

        a.     An automobile [or other vehicle such as a truck or sports utility vehicle];

        b.     A vacation certificate;

        c.     An item of electronic equipment [such as a camera, television, or stereo];

        d.     An item of jewelry [watch, bracelet, etc]; or

        e.     A check [often in an amount of at least $1500.00].

14. On such "front" sales, the salespersons/co-conspirators would imply that the least valuable premium guaranteed to be awarded was the item listed last (the check), when in truth and in fact, several of the items were worth substantially less than the last item listed, and the customer was not guaranteed to receive an item of significant value. In fact, in virtually every case, the customer was awarded the least valuable gift on the list, usually the "vacation certificate" or a "collectible" such as an item of memorabilia or minor historical artifact which had been offered in the

6

initial list of premiums.

15.    The salesperson/co-conspirator would require a minimum purchase of advertising speciality items (such as pens, mugs, or magnetic business cards), usually in an amount of no less than approximately \$498.00 or \$598.00, to qualify for one of the promised gifts or premium awards. The salespersons by their statements implied that the value of the advertising specialty items and premiums combined, exceeded the dollar amount of the purchase from Best Marketing. In fact, the true value of the advertising specialty items ordered, combined with the true value of the premium actually awarded, was a fraction of the total amount paid by the typical customer.

16.    It was further a part of the conspiracy that defendant and other Best employees, as Best Marketing's business continued, would and did limit and cause the limiting of telephone calls to avoid customers in states where complaints and/or legal action were more likely to take place, and where the fraudulent nature of Best's business operations was more likely to be exposed.

17.    It was further a part of the conspiracy that, following a customer's initial purchase, the customer's name would be given, under the direction of HEXTER, to one of the "loader/re-loader" defendants GOLDBERG, DUDLEY, PENNEY and MARTIN, or another "loader/re-loader" to "re-sell" the customer a quantity or quantities of advertising specialty items at inflated prices, with a variation on the previously used premium award "pitch," that tied continued customer purchases of advertising specialty items to the award of one in four or more guaranteed premiums. To this end defendants GOLDBERG, DUDLEY, PENNEY and MARTIN, under the supervision of HEXTER, at the various times of their employment, used the various phone names indicated, supra, and re-contacted customers to indicate that the contacted customers had a special status as a designee and/or potential designee of a major or extraordinary award selected by Best Marketing, which would be

7

obtained by an additional purchase of advertising specialty items.

18.    Thus, defendants would "re-load" or "re-sell" or cause the "re-loading" or "re-sale" of customers with explicit and/or implied promises that the value of the premiums to be awarded would far exceed the dollar amount expended by the customer, where, in truth and in fact, the funds expended by the customer would far exceed the true value of the advertising specialty items combined with the true value of the premium or premiums given. Further, rather than being a drawing or selection in which a customer had a viable opportunity to receive a premium of the highest value "down the road" (with the top premium usually represented to be an automobile or other vehicle), the selection process was pre-determined by the re-loader who always selected a premium designed to at least minimally satisfy the customer, while assuring a significant commission to the "loaders" and profit to Best Marketing and HEXTER.

19.    It was part of the conspiracy that the "loaders/re-loaders" were permitted by HEXTER to vary their sales presentations or "pitches" according to the skill and experience of the "loaders" to utilize one or more of the scenarios indicating the special status of the customer, whether as the "Businessman of the Year," or "Grand National Finalist," or "state finalist," or selectee of a random computer designation; any such special "status" was represented to be peculiar to the customer who was being "pitched" or sold, when in truth and in fact such status was not unique but was common to numerous customers contacted by "re-loaders" and was the result of a pre-written or pre-planned "pitch" designed to flatter and deceive the customer into parting with his/her monies or credit card funds expended on advertising speciality items on the expectation of more valuable merchandise or premiums to be awarded then and/or in the future. Often, it was represented that another purchase of advertising speciality items would guarantee the customers the opportunity to progress to the next

8

level of premium award, such as a significant portion of "$500,000" in bonuses or awards.

20.    It was further a part of the conspiracy that the defendants, at various times, made or caused the making of interstate telephone calls containing false and misleading statements representations and promises, including but not limited to the following:

A.    During "front" pitches, on initial contact by Best, a customer was promised a real opportunity to receive one of approximately five "major" premiums or bonuses, which were by implication, worth more than the purchase price of the advertising specialty items purchased, when in truth and in fact, the bonus to be awarded was pre-determined by the salesperson and/or Best Marketing and in virtually all cases was worth a fraction of the amount expended by the customer.

B.    During "re-load" (secondary or repeated) sales pitches, each customer was told that he/she had a special status as a selected recipient of a major award such as a businessman/businesswoman/businessperson of the year or grand national or state finalist or other specially selected recipient(selectee) of a bonus which could be received upon another purchase of Best merchandise, when, in truth and in fact, numerous individuals had the same status, which was nothing extraordinary at all, and all "re-load" customers were being given virtually the same deceptive pitch and could not and would not receive the top premiums.

C.    During various pitches, defendants often represented or caused the representation that a photo was needed for publicity to attract more

9

customers upon receipt of the major award, when in truth and in fact, in

virtually all cases, a photo would not be used as publicity to attract

customers and the customer would not receive the major award.

D.     During the "re-load" pitches, the customer was told he was dealing with

"Mike Gordon," "David Best," or "Bill Swanson;" with "Ted Brown," "Ed

White," or "Russ Walton;" with "Lincoln Green," "Dr. Grant Maxwell,"

"Jim St. James," or "Dr. St. James;" or with "Charlie Cole," "Jerry Fried,"

or "Fred Murphy;" when in truth and in fact, GOLDBERG, DUDLEY,

PENNEY and MARTIN, respectively, as indicated, supra, were the real

names of the individuals with whom customers were dealing.

E.     With "re-load" pitches customers were often told that they were dealing

with an officer, director, or other principal of Best Marketing, when, in

truth and in fact, they were dealing with "re-loaders," salesmen with no

official corporate status or power.

F.     With "re-load" pitches, customers were told, directly and indirectly, at

various times, that the persons selling to them again (the "re-loaders") had

some special knowledge of or ability to determine the selection of the

customer for the top awards, often by language indicating that the

individual representing Best Marketing would "take care of" or look after

the customer, or by other language indicating that the Best representative

was steering the selection of the customer for one of the top awards when

in truth and in fact, the customer would not and could not receive the top

10

award.

H.    In some cases, it was indicated to customers that Best would pay all of the taxes due on any award or premium, when, in truth and in fact, neither Best nor its representative ever took such steps for its customers.

I.    In "re-load" sales, it was usually indicated in the language of superlatives that a premium was the "nicest" or "most expensive" thing the company had ever done or the customer could ever receive, when in truth and in fact, many customers had and would receive the same or equivalent item(s) and Best representative made virtually the same superlative promises to every customer.

J.    Both initial customers and "re-load" customers were told that they had a genuine chance to win an automobile or other vehicle (often with several selections of make and model in the same promotion) which would definitely be awarded, when, in truth and in fact, no more than one car a year was ever awarded, and that customer was personally chosen by HEXTER or his designated representative, not by any random selection, and at no time did Best ever award all of the makes and models represented in the "pitches" to customers.

K.    In the "re-load" pitches, customers were told that a particular award or promotion was coming up in the next weeks or months...or especially for a certain holiday or time of year, to induce the customer to act quickly to make additional purchases, when in truth and in fact, virtually identical offers were

11

being made to customers all the time and on a continuing basis without regard
to the date or event which was used as an excuse or convenient reference for
the solicitation.

21.   It was further a part of the conspiracy that defendants often used and directed the use
of credit card charges or overnight courier services to pick up checks or payments, to quickly obtain
monies and credits before customers could further investigate Best Marketing or re-consider the
wisdom of their purchases.

22.   It was further part of the conspiracy that defendants would exchange and/or direct the
passing of customer names for re-selling efforts by others, or, as the interest of the "re-loader"
defendants appeared, they themselves would use different phone names with the same customer to
create a new opportunity to "re-sell" to the individual, advertising specialty items at inflated prices.

## OVERT ACTS

The following overt acts, among others, were committed in the Southern District of Florida,
by at least one of the co-conspirators, in furtherance of the conspiracy and to effect and accomplish
the objects of the conspiracy:

23.   On or about August 30, 1993, defendant EDWARD HEXTER, a/k/a David Best,
caused a lease agreement to be signed by and between Best Marketing as tenant and SM 101,
Limited, A Florida Limited Partnership, SM Corporation, General Partner, as landlord, for the
Lauderhill, Florida, office space.

24.   On or about January 25, 1995, defendant EDWARD HEXTER, a/k/a David Best,
purchased lead sheets from American Business Lists, which contained the names of potential
customers.

12

25.    On or about March 6, 1996, defendant EDWARD HEXTER, a/k/a David Best, caused to be filed with the Florida Secretary of State a 1996 Annual Report, identifying himself, HEXTER, as the president and director of Best Marketing.

26.    On or about April 23, 1996, defendant EDWARD HEXTER, a/k/a David Best, represented to R.L. Wright that Wright would receive three of the named premiums, which would be "randomly computer selected."

27.    On or about May 30, 1996, defendant EDWARD HEXTER a/ka David Best represented to William Latham by correspondence that Latham would receive one of five named premiums, which would be "randomly computer selected."

28.    On or about March 11, 1996, defendant MARK GOLDBERG, a/k/a Mike Gordon, placed an interstate telephone call to Eugene J. Grawe, in the state of Illinois for the purpose of selling advertising specialty items.

29.    Defendants DUDLEY, PENNEY and MARTIN engaged in and/or caused interstate telephone communications with victims, which are described in Counts 2-31 below, each of which is incorporated herein by reference as an overt act of the named defendant, which was committed in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2-31

30.    Paragraphs two through twenty-nine of Count 1 of this indictment are realleged and incorporated herein by reference as though fully set forth herein.

31.    From at least 1991, to at least on or about July 17, 1996, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

13

EDWARD HEXTER,
a/k/a "David Best,"
MARK GOLDBERG,
a/k/a "Mike Gordon,"
a/k/a "David Best,"
a/k/a "Bill Swanson,"
ROBY DUDLEY,
a/k/a "Ted Brown,"
a/k/a "Ed White,"
a/k/a "Russ Walton,"
CHARLIE MARTIN,
a/k/a "Charlie Cole,"
a/k/a "Fred Murphy,"
a/k/a "Jerry Fried,"
and
HANNIBAL PENNY,
a/k/a "Jim St. James,"
a/k/a "Lincoln Green,"
a/k/a "Dr. Grant Maxwell,"
a/k/a "Dr. St. James,"

knowingly and willfully devised and intended to devise a scheme and artifice to defraud and for the purpose of obtaining money from persons throughout the United States by means of false and fraudulent pretenses, representations and promises, well knowing that said pretenses, representations and promises, would be and were false when made, as set forth in paragraph 30, supra.

## WIRE FRAUD

32.    On or about the dates enumerated as to each count below, at Lauderhill, Broward County, in the Southern District of Florida, and elsewhere, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations and promises, and attempting to do so, the defendants as described in each count below, did knowingly and willfully transmit and cause to be transmitted in interstate and foreign commerce by means of wire communication certain signals and sounds, as

14

more particularly described below:

| COUNT | DEFENDANT | DATE | WIRE COMMUNICATION FROM LAUDERHILL, FLORIDA |
|-------|-----------|------|---------------------------------------------|
| 2 | ROBY DUDLEY, a/k/a Ted Brown | 02/23/96 | Interstate telephone call to Gerard Baldocchino, in the state of Maine. |
| 3 | ROBY DUDLEY, a/k/a Ted Brown | 02/27/96 | Interstate telephone call to Dave Brownfield, in the state of Michigan. |
| 4 | ROBY DUDLEY, a/k/a Ted Brown | 03/01/96 | Interstate telephone call to R.L. Wright, in the state of Virginia. |
| 5 | ROBY DUDLEY, a/k/a Ed White | 03/06/96 | Interstate telephone call to David D. Poffenberger, III, in the state of Delaware. |
| 6 | ROBY DUDLEY, a/k/a Ted Brown | 04/23/96 | Interstate telephone call to R.L. Wright, in the state of Virginia. |
| 7 | ROBY DUDLEY, a/k/a Ted Brown | 05/17/96 | Interstate telephone call to Larry Humphrey, in the state of Tennessee. |
| 8 | ROBY DUDLEY, a/k/a Ed White | 05/29/96 | Interstate telephone call to David D. Poffenberger, III, in the state of Delaware. |
| 9 | ROBY DUDLEY, a/k/a Ted Brown | 06/03/96 | Interstate telephone call to Jim Vogelpahl, in the state of Kentucky. |
| 10 | ROBY DUDLEY, a/k/a Ted Brown | 06/10/96 | Interstate telephone call to Victor L. Bench, in the state of Missouri. |
| 11 | HANNIBAL PENNEY, a/k/a Dr. Grant Maxwell | 02/08/96 | Interstate telephone call to Rick Clark, in the state of New York. |
| 12 | HANNIBAL PENNEY, a/k/a Dr. Jim St. James | 02/16/96 | Interstate telephone call to Mike Carey, in the state of Michigan. |
| 13 | HANNIBAL PENNEY, a/k/a Dr. St. James | 03/26/96 | Interstate telephone call to Irving Amron, in the state of New Jersey. |

| COUNT | DEFENDANT | DATE | WIRE COMMUNICATION FROM LAUDERHILL, FLORIDA |
|-------|-----------|------|---------------------------------------------|
| 14 | HANNIBAL PENNEY, a/k/a Dr. St. James | 3/27/96 | Interstate telephone call to Vickie Keel, in the state of Alabama |
| 15 | HANNIBAL PENNEY. a/k/a Dr. Jim St. James | 03/29/96 | Interstate telephone call to Bernard Roy Baker, in the state of New York. |
| 16 | HANNIBAL PENNEY, a/k/a Lincoln Green | 05/02/96 | Interstate telephone call to Dr. J. Gordon Longenecker, in the state of Pennsylvania. |
| 17 | HANNIBAL PENNEY, a/k/a Dr. Grant Maxwell | 05/07/96 | Interstate telephone call to George Bayer, in the state of Nebraska. |
| 18 | HANNIBAL PENNEY, a/k/a Dr. Grant Maxwell | 05/28/96 | Interstate telephone call to Patricia Lindmark, in the state of Louisiana. |
| 19 | HANNIBAL PENNEY, a/k/a Jim St. James | 05/29/96 | Interstate call to Irving Amron, in the state of New Jersey. |
| 20 | HANNIBAL PENNEY, a/k/a Dr. Grant Maxwell | 06/28/96 | Interstate telephone call to Dr. Terry Nofziger, in the state of Indiana. |
| 21 | CHARLES MARTIN, a/k/a Charlie Cole | 02/13/96 | Interstate telephone call to Ray Terrizzi, in the state of Pennsylvania. |
| 22 | CHARLES MARTIN, a/k/a Charlie Cole | 02/21/96 | Interstate telephone call to Rick Ackerson, in the state of Maryland. |
| 23 | CHARLES MARTIN, a/k/a Jerry Fried | 04/03/96 | Interstate telephone call to William Latham. in the state of Minnesota. |
| 24 | CHARLES MARTIN, a/k/a Charlie Cole | 04/10/96 | Interstate telephone call to Ray Terrizzi, in the state of Pennsylvania. |

| COUNT | DEFENDANT | DATE | WIRE COMMUNICATION FROM LAUDERHILL, FLORIDA |
|-------|-----------|------|---------------------------------------------|
| 25 | CHARLES MARTIN, a/k/a Fred Murphy | 04/16/96 | Interstate telephone call to Ray McEachern, in the state of Minnesota. |
| 26 | CHARLES MARTIN, a/k/a Charlie Cole | 05/03/96 | Interstate telephone call to Ron G. Hall, in the state of Oklahoma. |
| 27 | CHARLES MARTIN, a/k/a Jerry Fried | 05/30/96 | Interstate telephone call to William Latham, in the state of Minnesota. |
| 28 | CHARLES MARTIN, a/k/a Fred Murphy | 06/03/96 | Interstate telephone call to Ray McEachern, in the state of Minnesota. |
| 29 | CHARLES MARTIN, a/k/a Fred Murphy | 06/04/96 | Interstate telephone call to Raymond Hewett in the state of Ohio. |
| 30 | CHARLES MARTIN, a/k/a Fred Murphy | 06/05/96 | Interstate telephone call to Richard Vorel, in the state of Illinois. |
| 31 | CHARLES MARTIN, a/k/a Charlie Cole | 06/06/96 | Interstate telephone call to Ray Terrizzi, in the state of Pennsylvania. |

17

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

FOREPERSON

GUY A. LEWIS
UNITED STATES ATTORNEY

DEBRA J. STUART
ASSISTANT U.S. ATTORNEY

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO. _____

v.

Edward Hexter, Mark Goldberg, Roby
Dudley, Charlie Martin and
Hannibal Penney

**CERTIFICATE OF TRIAL ATTORNEY***

_____/

**Superseding Case Information**:

Court Division: (Select One)

New Defendant(s)          Yes ____     No ____
Number of New Defendants   ____

___ Miami  ___ Key West      Total number of counts   ____
_X_ FTL    ___ WPB ___ FTP

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants,
     the number of probable witnesses and the legal complexities of the Indictment/Information
     attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the
     Judges of this Court in setting their calendars and scheduling criminal trials under the
     mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:          (Yes or No) NO _____
     List language and/or dialect  _____

4.   This case will take  _25_  days for the parties to try.

5.   Please check appropriate category and type of offense listed below:
     (Check only one)                              (Check only one)

I    0 to 5 days         _____          Petty      _____
II   6 to 10 days        _____          Minor      _____
III  11 to 20 days       _____          Misdem.    _____
IV   21 to 60 days       _X_            Felony     _X_
V    61 days and over    _____

6.   Has this case been previously filed in this District Court? (Yes or No) NO
If yes:
Judge: _____          Case No. _____
(Attach copy of dispositive order)

Has a complaint been filed in this matter? (Yes or No) _NO_____
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____        District of _____
Is this a potential death penalty case? (Yes or No)_____  NO
7.   Does this case originate from a matter pending in the U. S. Attorney's Office prior to
April 1, 1999? _X_ Yes _ No    If yes, was it pending in the Central Region? _X_ Yes _ No

8.   Did this case originate in the Narcotics Section, Miami? ___ Yes _X_ No

                    _____
                    DEBRA J. STUART
                    ASSISTANT UNITED STATES ATTORNEY
                    Court Bar No. A5500061

*Penalty Sheet(s) attached                                              REV.6/27/00

**SOUTHERN DISTRICT OF FLORIDA**
**PENALTY SHEET**


Defendant's Name: _EDWARD HEXTER_         No.: _____

Counts #: 1 Conspiracy to commit wire fraud ( 18 U.S.C. 371)_____

*Max Penalty: Five years' imprisonment, $250,000 fine or twice the amount of gain or loss, whichever is greater; supervised release and $100 special assessment_____

Counts #:_____

*Max Penalty_____

Count #:_____

*Max Penalty:_____


**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96

**SOUTHERN DISTRICT OF FLORIDA**
**PENALTY SHEET**

Defendant's Name: <u>MARK GOLDBERG</u>         No.: _____

Counts #: 1 Conspiracy to commit wire fraud ( 18 U.S.C. 371) _____

*Max Penalty: Five years' imprisonment, $250,000 fine or twice the amount of gain or loss, whichever is greater; supervised release and $100 special assessment _____

Counts #: _____

*Max Penalty _____

Count #: _____

*Max Penalty: _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PENALTY SHEET**

Defendant's Name: <u>ROBY DUDLEY</u> _____   No.: _____

Counts #: 1 Conspiracy to commit wire fraud ( 18 U.S.C. 371) _____

*Max Penalty: Five years' imprisonment, $250,000 fine or twice the amount of gain or loss, whichever is
greater; supervised release and $100 special assessment _____

Counts #: 2-10 Wire Fraud (18 U.S.C. 1343) _____

*Max Penalty as to each count: Five years' imprisonment , $250,000 fine plus supervised release and
special assessment

Count #: _____

*Max Penalty: _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special
assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96

**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

Defendant's Name: __HANNIBAL PENNEY__      No.: _____

Counts #: 1 Conspiracy to commit wire fraud ( 18 U.S.C. 371)_____

*Max Penalty: Five years' imprisonment, $250,000 fine or twice the amount of gain or loss, whichever is greater; supervised release and $100 special assessment_____

Counts #: 11-20  Wire Fraud (18 U.S.C. 1343)_____

*Max Penalty as to each count: five years' imprisonment, $250,000 fine plus supervised release and $100 special assessment:_____

Count #: _____

*Max Penalty: _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PENALTY SHEET**

Defendant's Name: <u>CHARLES MARTIN</u>        No.: _____

Counts #: 1 Conspiracy to commit wire fraud ( 18 U.S.C. 371) _____

\*Max Penalty: Five years' imprisonment, $250,000 fine or twice the amount of gain or loss, whichever is greater; supervised release and $100 special assessment _____

Counts #: 21-31 Wire Fraud (18 U.S.C. 1343) _____

\*Max Penalty    As to each count five years' imprisonment, $250,000 fine plus supervised release and $100 special assessment

_____

Count #: _____

\*Max Penalty: _____

_____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96